Nellie I. Brown v. Commissioner.
Brown v. Commissioner
Docket No. 4992-64.
United States Tax Court
T.C. Memo 1966-92; 1966 Tax Ct. Memo LEXIS 193; 25 T.C.M. (CCH) 498; T.C.M. (RIA) 66092; April 28, 1966
*193 Grant N. Nickerson, 205 Church St., New Haven, Conn., for the petitioner. Frederick A. Griffen, for the respondent. MURDOCK
Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency of $35,073 in gift tax of the petitioner for 1961 based upon a fair market value of $258,300 for 42 shares of The Brown and Thomas Automobile Company stock instead of the $105,000 value reported in the return. The only issue for decision is the fair market value of the 42 shares given by the petitioner to her son in 1961. Findings of Fact The petitioner filed a gift tax return for 1961 with the director of internal revenue at Hartford, Connecticut. She had given her son 42 shares of stock of The Brown and Thomas Automobile Company, hereafter called the Company, on January 11, 1961, and reported the fair market value of those shares in her gift tax return as $105,000. The Commissioner, in determining the deficiency, held that the fair market value of the 42 shares was $258,300. The Company at all times material hereto was engaged in the business of selling and servicing new and used Cadillac and Oldsmobile cars. Its place of business was New Haven, Connecticut. *194 It had competition in the area. Harry H. Brown, Sr., the husband of the petitioner and the father of their son Harry H. Brown, Jr., was the founder and, until his death on December 14, 1955, the president and chief stockholder of the Company. He was also the holder of the franchise agreements under which the Company sold the cars during that period. Harry H. Brown, Jr., obtained and held the franchise agreements thereafter. A profitable distributor franchise formerly held was terminated by Cadillac in 1956. Harry, Sr., held 61 shares of the 120 outstanding shares of the stock of the Company at the time of his death, the petitioner held 23 shares, and Harry, Jr., held 35 shares. Arnon D. Thomas held one share at all times material hereto. The par value of the shares was $100. The value of the shares held by Harry, Sr., was finally determined for Federal Estate tax purposes to be $2,500 per share as of December 14, 1955. The petitioner made gifts of Company shares to Harry, Jr., 6 shares in 1955, 4 in 1956 and 5 in each of the years 1957, 1958 and 1959, and in her gift tax returns for those years reported the shares as having a fair market value of $2,500 each. The Company on *195 January 15, 1958, purchased 12 shares of its stock for $2,500 per share from the estate of Harry, Sr., and carried them thereafter as treasury stock. The remaining 49 shares in Harry, Sr.'s estate were transferred in 1959 to the petitioner, the sole beneficiary under Harry, Sr.'s will. There were no other sales or transfers of the Company stock at any time material hereto. It was not sold, listed or quoted on any exchange. No dividends were paid on the stock of the Company after 1955. Dividends of $200 per share were paid in 1952, 1953, 1954 and 1955 and one of $300 per share was paid in 1951. The Company earnings for the years 1951 through 1955 averaged $413.03 per share and for the years 1956 through 1960 averaged minus 80 cents per share. The fair market value of the 42 shares given by the petitioner to her son was $105,000, or $2,500 per share, on January 11, 1961, the date of the gift. All stipulated facts are incorporated herein by this reference. Opinion MURDOCK, Judge: The determination of the Commissioner normally carries a presumption of correctness which throws the burden of proof upon the petitioner to show that the fair market value of the 42 shares of stock *196 on January 11, 1961, was less than the $258,300 value used by the Commissioner in determining the deficiency. However, the Commissioner here asks for a lower value. He called as a witness a man employed in the Internal Revenue Service as a security analyst, who gave $5,890 as his opinion of the fair market value of each of the 42 shares on January 11, 1961. The value of 42 shares in the opinion of that witness, would apparently be $247,380, or $10,920 less than the value on which the deficiency is based. So the way is clear for the Court to find the fair market value of 42 shares on January 11, 1961, as best it can from all of the evidence before it. Counsel for the Commissioner stated that the Commissioner "in determining the fair market value of the stocks in question, used the net worth value per share which was $6,545 and subtracted therefrom $395 per share for allowance of nonmarketability and arrived at a fair market value per share of $6,150." He argues that one must start with book value as the main factor in determining fair market value. The force of this argument is not overwhelming. It has been stipulated that the book value per share at the close of 1960 was $6,545 but *197 there is no evidence to show how book values of the assets and liabilities compared with actual values of the assets at any time material hereto. The Commissioner's valuation witness used the same book value but subtracted "10 percent for limited marketability, which brought the price to $5,890." The witness had never seen the place of business or the assets and assumed that they were all worth their book values. Book values of assets are frequently based on their cost and, in such case, could vary substantially from current market value. The reasoning of this witness included several other unjustifiable assumptions favorable to the Commissioner but contrary to the evidence and the facts. He stumbled over the definition of fair market value. His reasoning and conclusion are not convincing. The respondent relies almost entirely upon the unsupported statements, reasoning and conclusion of this witness. Harry, Sr., owned 61 shares at the time he died and it is admitted by the Commissioner in his answer that the value of those shares "was finally determined for Federal estate tax purposes" to be $2,500 per share, or $152,500 as of December 14, 1955. There is evidence showing that nothing *198 happened to increase the value of the shares between Harry, Sr.'s death and the gift to Harry, Jr. Earnings for 1955 were $624.64 per share and for the next five years averaged minus 80 cents per share. A profitable distributor franchise was terminated in 1956. Thereafter, sales could be made at retail only. The petitioner made gifts to Harry, Jr., of 6 shares in 1955, 4 in 1956 and 5 in each of the years 1957, 1958 and 1959, reported the per share value at $2,500 for each year in gift tax returns and there is no indication that the Commissioner did not accept those values. The Company, on January 15, 1958, purchased 12 shares from Harry, Sr.'s estate at $2,500 per share. The 42 shares involved herein did not represent a controlling interest in the Company. They were less than 39 percent of the outstanding shares. The petitioner called as a valuation witness a man who had been employed for 12 years by an old established brokerage firm in New Haven and who since 1958 had served as a security analyst in the firm's research department. He had knowledge of the Company, its place of business and its reputation in the New Haven area. He described in considerable detail how he had made *199 and checked his valuation of the 42 shares involved herein. He came to the conclusion that the fair market value of those shares on January 11, 1961, was "$2,500 a share, certainly not more." He was the most helpful witness as to fair market value and his opinion is entitled to weight. The fair preponderance of the evidence supports and the Court has come to the conclusion that the fair market value of the 42 shares on January 11, 1961, was $2,500 per share or a total of $105,000. Decision will be entered for the petitioner.